We're ready for argument in our last case, AirFacts, Inc. v. Amezaga. Mr. Hanses, we'll be glad to hear from you. May it please the court, my name is Nicholas Hanses and I represent AirFacts in this case. This case presents important issues about employers' right to protect company information. Companies cannot succeed if they don't have protection for their investment in information. This judge failed to appreciate that AirFacts had the right to information generated by this employee. The district court implicitly and explicitly adopts the view that employees have the right to that information, but there's no basis in law, in fact, for that finding. Section 3.2 of the employment agreement states an employee has no ownership interest or rights in information he generates during his employment. Section 4.2 of the employment agreement required the employee to return the information upon his termination. Well, let me, counsel, let me ask you a question that comes from the inquiry that the court sent to counsel earlier, and that's the threshold issue of whether or not we have a final order in this case, and we got your supplemental briefing. So I'm assuming that your position is there is a final order with respect to the breach of contract claim under Section 4 of the employment agreement, and that your position is that the district court did address that issue, and it found, I assume from the Appelese brief, that their contention would be the court found that you abandoned that claim, and that your position is that no, you did not abandon it, and that was an error on the district court's part. Correct. All right. So at some point, you're going to address whether or not you abandoned the claim. Yes, Your Honor. Let me ask you along that line. Normally after a bench trial, a judge will ask you to submit findings of facts, conclusions of law. I can't find whether that was done in this record. Was it done? It was not. And so, okay. So what do you get under that contract claim for return of property? All you get is the sheets of paper he took, right? No. Well, we get the attorney's fees and forensic evidence collecting it. We also get the cost of redoing the software that we did. We had certain software that we provided to Alaska Airlines. We had to change it because there was a data fee. Is that it on your contract claim? And you didn't say anything about attorney's fees and reprogramming and all that sort of thing. You said, yeah, that's it. Your Honor. What was she supposed to think? Your Honor, I think if the judge wrote in her opinion that my client abandoned all the court. If the court was asking, are you abandoning your court? The district court didn't use the term abandoned, did it? No. The court narrowed its claim is the term the court used. That's the only language I saw at one place that said it narrowed its claim. But unlike your conversion claim, it did not address abandonment. Right. And also, unlike the 7.2 section of the confidentiality, there were two non-solicitation provisions that were originally bought. And the court explicitly rejected, stated that counsel abandoned the 7.2 provision and only proceeded under AD. If you wanted $100,000 for attorney's fees and the cost of having a forensic person go in there, why didn't you say that when she asked, is that the end of your contract? Trial counsel had asked earlier during the course of the proceeding, when is the court going to hear attorney's fees? At the end of the third day. Well, but what about forensic costs and reprogramming costs and all that? That's not attorney's fees. Well, my understanding was that when he asked about attorney's fees, he was also asking about cost. I mean, Your Honor, I think what's important here is in order to have an abandonment of a claim, you have to have an intentional and knowing waiver. And if a court is asking a party whether they're going to drop a claim, a 4.2 claim, the court should just ask that. Are you, Mr. Bromberg, dropping on behalf of your client section 4.2? Rather than asking a question, do you have any other allegations that you intend to, any other claims you intend to pursue under your breach contract claim? And then calling that a narrowing of the claim. Well, nobody knows your claims better than you. Well, I understand that, Judge. And I understand that. But the case law under Santos is an ambiguous statement made during oral argument does not waive an issue when it's been clearly part of the pleadings and subject to court orders. We have that here. It was in the complaint. It was subject to the court entered two preliminary injunction orders that required the return of the documents, which is consistent with 4.2. The extensive testimony was presented during the course of the case on the efforts they went to to recover the documents.  Well, if we agree with you that you did not abandon your claim and the district court erroneously determined that you did, that would mean, wouldn't it, that the district court has never addressed that breach of contract claim on the merits? No, I think it means that the court, yes, except, well, yeah, the court ruled procedurally that you abandon it. So the court should have made a 54 ruling that you abandon it and put a factual predicate for that. So your relief for that would be to vacate that part of the judgment and send it back for the district court to determine in the first instance? Yes. Okay. Yes. Yes. And... Not the rest of the case, though? Well, we'd also like you to send back the rest of the case for all the very convincing reasons. You lost it all, bitch. Pardon me, Your Honor? But is it final as to the rest of it? Can this court hear that, hear the rest of it, if there's things that aren't resolved? We asked the court to remand the case for all the other claims as well, Your Honor. So... Well, but on the finality point, if part of it's not final, does it all go back? I think my answer to that is, if you find reasons to send the other parts back, you send them back. If you don't... I thought your answer to my first question was that you thought there was a final order because the district court, even though it did not rule on the merits, had ruled on the merits because it had found the claim to be abandoned and you consider that to be legal error. Yes. So that would be a final judgment as to that claim, but on an erroneous point. Correct. Well, if we found that there is no final order because he did, she did not address abandonment, we would just say we don't have jurisdiction and it goes back. I don't think that's the... Oh, I'm sorry. What's the court... No, I mean, I'm asking. Yeah. I don't... For the cases that we cited, the Brooker case, the Glenville case, that when there's a failure to make a 54B finding, the court has traditionally sent the case back for the court to make that finding. So there's no factual predicate for the abandonment decision in here, and therefore, you have to send it back to the court to make that factual predicate. I think the question is, do we send it back just to make that decision, and do we rule on the merits of the rest of it? Our position is that the court should send it back on that piece, and quite frankly, I can't... And our position is, if there's other errors, we'd like you to... You'd like us to rule now. Yes. But if it's... I don't... I mean, if the court believes that the appropriate thing is to go back and have the whole decision based on the 54B, that's the... We'd accept that rule as well. It seems like you get to go one of two ways. You either have an order that's not a final judgment because the court did not adjudicate with finality the breach of contract claim, and a final judgment, we don't have jurisdiction, goes back to the court, district court finishes. What I've understood you to say is that you have a contrary position, which if we accepted would mean there was a final judgment. The district court just erred on the abandonment claim, in which case we would address the other issues. But it seems like to me those are your only two choices. So, I understand the court presenting the two choices as the court, that the court... I'm sorry. I understand the court... Is the court presenting the two choices as either they find, the court finds there was... Send it back for the court to make, the trial court to make a finding on the abandonment issue. That's one choice. And then bring the whole thing back after that. And then the second choice is that there's no jurisdiction. If we're presented with those two choices, we would ask that you send it back. I'll tell you what, in the interest of time, why don't we just assume there's a final judgment and you tell us about the other claims. Okay. Yes, Your Honor. And with regard to the non-solicitation agreement, the non-solicitation provision prohibited the defendant from working for American using similar services to those performed by AIRFAX or anticipated services. The process of calculating the refunds is the service that the defendant performs at American in his capacity as a senior manager to refund, which is similar to what he did at AIRFAX. Further, he's providing services at American that were anticipated to be performed by American. The district court found no violation for reasons that were an improper application of the facts to the way the agreement is framed. The court said that, well, you perform auditing services, your company, and not refund services. But we do provide refund services. It's part of the audit process that you calculate refunds as part of the audit process the same way that American does. And, in fact, Ms. Fulmer, who was the American representative, admitted that. Ms. Pearson testified to it. Furthermore, the process of providing refunds was established to be the same. The defendant's own lawyer admitted the process of calculating refunds was the same. Ms. Fulmer acknowledged in her emails a refund is a refund, and Ms. Fulmer acknowledged that the refund is a refund in the context of a travel agency refund, which is exactly what our client does. So the evidence is clear, a refund is a refund. It's all calculated the same way that my client did that work at AIRFAX, and now is doing it at American, and accordingly, it's a similar service. Furthermore, there was some direct evidence, which we believe the court overlooked, which is misinterpretation of the agreement. While my client was employed at AIRFAX, he provided refund services to customers, including JetBlue and Alaska Airways. The court also acknowledges that the defendant does work in the travel agency audit department at American. The district court erroneously concluded, because AIRFAX wasn't providing those exact services for American while he was employed, that it wasn't covered by the agreement. But the agreement says if AIRFAX is providing that service at all at the time that he was employed to any customer, he's prohibited for a year from doing it for American. So we believe, and furthermore, there was evidence that my client, and furthermore, the court's argument that it wasn't for the same purpose is imposing a new term in the agreement. It just says you can't provide similar services. But here, the court said it has to be similar services for the same purpose. That's adding a term to the agreement. Furthermore, the court appears to read the requirement that it be both similar services and they be in competition. The agreement says or in competition. So those are two reasons that we believe the court misinterpreted the agreement and applied the evidence incorrectly. I'd also like to turn now to the question of the claims involving the Trade Secret Act. The fair by rule flowcharts, the court said, weren't trade secrets. And they are trade secrets. We believe the court was made, it was erroneous because one, the court said it was all public information. Well, during the course of his testimony, the defendant testified that those flowcharts were constructed of the ATPCO rules and his own ideas. And that's on page 756 of the record. And the reason I want to point that out is because we had the incorrect site in our brief. So it's his own ideas were part of those documents. So it's not solely public information. And that's on 756. Furthermore, the information isn't generally available to the public. It's information that you have to be a subscriber for and have to purchase. But more importantly, the court made a error at law by failing to recognize the comprehensive technologies case, which provides that a trade secret can consist of a combination of information in the public domain as long as the combination itself is a trade secret. And my client, Ms. Pearson, testified that this document had economic vitality, had economic value to the company because it showed processing logic, it increased the efficiency of the team. And so it meets all the requirements of a trade secret. I see my time is up. You've got some time on rebuttal. So we'll hear what you have to say then. Thank you. Mr. Goldstein. Good morning, your honors. My name is Jerry Goldstein. I represent the Epelee Diego de Amazaga. This case was all about the credibility of witnesses, primarily the credibility of the two principals, Diego de Amazaga and April Pearson. We had a week-long non-jury trial, 12 witnesses, something like 200 exhibits. And the judge, it was a judge trial, so she was in the best position to judge credibility. And she clearly did. And she clearly, in her opinion, discredited much of what April Pearson had to say. And that was because April Pearson's testimony was filled with hyperbole and sometimes flat-out false statements. For example, claiming that Airfax had a complete and finished product at the time for proration when it clearly didn't have any such product in use at the time, trying to imply that Airfax had spoken with American Airlines about proration when, in fact, those discussions were with U.S. Airways before the merger ever occurred with American Airlines. And she tried to portray that SPA proration sheet that Mr. Amazaga sent himself to answer questions from people at Airfax as the entire framework for proration when, in reality, it clearly wasn't. They didn't even have a contract between Airfax and Alaska Airlines until months after Mr. Amazaga left the company. Is it fair of the view that we do have jurisdiction here in the final order? That is our position that the, first of all, it was very plain, I'm the only one of us sitting there that day, that the judge repeatedly asked Airfax counsel to explain your breach of contract claim. And even at the end of it, when he was ready to move on to the count two misappropriation claim under the Maryland Trade Secret Act, he said, well, summarize your claim under count one. And he never mentioned paragraph 4.2. He said strictly paragraph 8.1D. Well, the standard for abandonment of a claim is somewhat high. Cases use the terms like express and explicit, intentional and knowing, and that if it's ambiguous, it's usually not deemed to be an abandonment. And I note here the district court has language you could read to be an abandonment, but you could also read it the other way when they talk about narrowing and then the court does dismiss all the claims. But unlike the conversion claim, where there was an express description as being waived or abandoned, you don't have exactly the same quality of disclaimer for the breach of contract claim. Well, as I said, if there was ever any doubt, when she asked him to summarize your claims under count one for me, at the end of the explanation, that was his chance. And all he said was 8.1D, and we want to extend the injunction that we had basically entered by consent. And the discussion that counsel here alludes to in the first part of the closing by Mr. Bromberg at the trial, really he wasn't addressing documents under paragraph 4.2. He was talking about credibility. He was trying to portray Mr. Amzaga as lacking in credibility, because we both knew that that's what this case was about, and trying to portray him as having done nefarious things with these documents. And the judge, in a nutshell, didn't buy that. And the other piece of this is that we're really dealing with a finite group of five documents. We were at trial. He's narrowed it now. There's only three here. And the judge made specific findings about each of those documents under the Maryland Trade Secret Act claim. So she actually did make the findings that she would need to make, even if they hadn't abandoned the claim, because she found that as to four of the five, they were based on public information that everybody in the industry knew. Well, their point is a different one. They, as far as he's concerned, if Mr. Amzaga walked off with a brochure that described what AIRFAX does, that's property they're entitled to get back. Well, first of all, that's not a correct reading of paragraph 4.2, which says it only pertains to documents dealing with confidential information. So by definition, if the court- Well, no, because in the first month of the case, we had said, well, first of all, he'd already given back his company phone and computer. And we said to them, here, take his personal phone and computer. Give it to your forensics person. Let them clean off whatever they want. Here's his login, his password. Do what you want. And by the way, you're going to find on there some documents, these flow charts that we talked about that were sent. And you're going to find this spreadsheet. And there was something else. And so it's not like the- I think the appellant's point is that their reading of the breach of contract provision is, if you leave employment and you take documents with you, whether they're in paper form or electronic form, whatever, that's a breach of the contract. And because of that breach, we're entitled to prove damages. Now, maybe they can. Maybe they can't. I don't know. But as I look at the question, it is, if the court were to determine that there was not an abandonment of the breach of contract claim, whether or not they prove breach, or whether or not if they prove breach, they're entitled to any damages, is simply a question that this report never addressed. Well, what I'm saying, though, is that under paragraph 4.2, the only documents that could be found to have been retained that would violate it are ones that had confidential information. That's what the paragraph itself says. And the judge, in the context of the Trade Secret Act claim, had to deal with those documents. By the way, in their brief to this court, they don't even mention which documents they say are the ones that would violate paragraph 4.2. But assuming the universe is the five things that the court dealt with at trial, she made specific findings about each one and why they weren't trade secrets. But the same facts apply to why they weren't confidential information. As to the flowcharts, they were. But you could have a breach of contract without it being a breach of the Trade Secrets Act. You can only have a breach of a contract if the documents contained confidential information and if he didn't have implied authority to have it, which is the case with the… Right. But the elements for a violation of the Trade Secrets Act are different from, do you have a breach of contract for taking stuff? Normally, that would be the case. But here, where the contract spoke to confidential information, which the findings would be the same whether it was under the Trade Secret Act claim or under the contract claim. If the documents dealt with ATPCO, Airline Carrier Publishing Company, information that everybody in the industry had and used, it couldn't be confidential information either under the contract or the Trade Secret Act. And if he was entitled to, he had implied authority to take the SPA proration thing to answer questions at the request of three of the senior people at Airfax, and he did answer questions after he left, then… But wasn't all that the determinations of fact and credibility and things for the District Court to determine in the first instance that it never did? It did. I'm saying it did do those things because it had to for the very same, for the Trade Secret Act claim, even if it didn't do them specifically under the breach of contract claim. You're saying that the finding of the Trade Secret Act, that this was information that was protected because of its commercial interest, is the same, is the functional equivalent of what you would have to find under the confidentiality? In this case, it is. I'm not saying it would be in every case. But in this case? In this case, yes. Well, this case was tried essentially as a non-compete in a Trade Secrets Act case. Is that right? That's pretty much what you all were litigating. Yeah, yeah. And there were also a bunch of documents on Mr. Amazaga's computer that were from ages ago that counseled for Airfax at closing arguments that we're not making a claim about those. So we were down to just basically these five documents. Again, only three that are even applicable here. And the court, as I said, not only made findings about each of those documents based on the credibility of witnesses, but in her final order in the case, said that she granted, she ruled in favor of Mr. Amazaga on all the counts in the complaint. So you wouldn't have to go back to the district court. She's ruled. And she's ruled, and the facts are in the record, and in her opinion, in detail. But under the theory of your case, she ruled on the breach of contract case because she deemed it abandoned. Yes, she didn't rule on it in the context of paragraph 4.2 because she deemed it abandoned. That's right. Tell us why the fair by rule flow charts are not trade secrets. The fair by rule, first of all, the ATPCO rules, there's 50 categories. It's thousands of pages long. Fair by rule is one of the more complicated ones. And the flow charts basically just took that information and said, this is the way it works. It was used as a teaching tool by Amazaga to try and show the Airfax people, this is how it works. In fact, that's what he did for ATPCO for the six years he worked there. He was a trainer. He was an expert in the rules and went around training people, both inside the company and within the airline industry. So he explained how the things work using teaching tools, and this was just another of those. I would note that, and I would say that the fact that the flow charts incorporated his knowledge from having worked in the industry for years prior to coming to Airfax doesn't make that knowledge any more a trade secret than a doctor's knowledge, the medical knowledge that he acquires in his profession before he goes to work for some practice. It doesn't become the trade secret of the practice on that basis. And then the Airfax cited a case called Comprehensive Technologies International versus Software Artisans trying to say essentially that, that these things had some elements of trade secret in them. But first of all, that case was vacated and dismissed by this court a month after it was issued, so it's not even a viable decision. But to the extent it ever was, it really is helpful to us, not to them, because the court said there that it was dealing with publicly available information and the arrangement of it that had been done by the defendant in that case was something anybody in the industry would have to do. And so same here. Everybody has to apply it the same way, and it doesn't matter whether you're American Airlines or you're Airfax or anybody else. The rules are the rules. And it also wouldn't matter whether they were automated or applied manually. Anybody should get the same result. And I would also want to address this idea that the refund process at American that Amazago was in charge of is both different in process and in purpose than what Airfax does. Airfax has one product. It audits tickets sold by travel agents to determine if they were properly issued under these rules of ATPCO. And if they're not, if they weren't, the airline clients that pay Airfax are told about it, and they issue a debit memo to the travel agency, and they get paid whatever they're properly entitled to. The refund process at American is where all they do is they get a contact from one of their customers, usually online, who says, I'm entitled to a refund for this ticket I bought. And American then goes through a process to determine if he's entitled to all or of a ticket refund based on its internal policies and using a computer program that existed long before Mr. Amazago ever went to work for American. So that department does not get involved with ticket auditing. There's a separate department of American that deals with ticket auditing. Airfax has a contract with them to audit tickets sold by the travel agents. And that's all that Airfax does. I mean, Airfax has never, ever tried to get the refund business of American. It has never tried to get the proration business of American. Mr. Amazago doesn't work in either of those departments, doesn't have anything to do with them. And the court found specifically on those items. So basically, Mr. Amazago did everything he could to try and satisfy Airfax that he wasn't doing anything wrong. Before he even went to work at American, he took his employment contract from the legal department through the people at American and a letter from the Airfax lawyer that was a reminder to him and said, you know, here, look at this. I can't be doing any of this stuff. And they had him sign something saying he understood that and he wouldn't violate it and hadn't violated it. And then they even had his supervisor, Brenda Fulmer, send out something to all the department managers that he might have to deal with at American, warning them about this and saying don't deal with him on any of these topics. And so he made every effort to be transparent and not do anything. And bottom line is he never accessed any of these documents. They've never been used to make it for any commercial purposes by anybody, Mr. Amazago or anybody else. And so the bottom line is the evidence was that Mr. Amazago never used any confidential information to harm Airfax, no longer has any. It was all turned back to them early on. Has not used any confidential Airfax information in his job at American. Has not stolen any customers from Airfax. Is not competing against Airfax. And hasn't caused Airfax to lose any business. They didn't even make a lost profits claim. And as far as any dollars of damage that they asserted here, the senior people in Airfax who testified said that Airfax didn't have to do anything to change anything because of anything that Amazago did. So there were no damages. They did try and assert a claim for $2 million of damages under the trade secrets act with an expert and all that. But that was, first of all, you can't, even if somebody misappropriates a document under Maryland law, if it's not used, you can't get an injunction under that Lejeune case that we cited because there's no inevitable disclosure law in Maryland. And you can't get a claim for damages under misappropriation unless there's, they were seeking damages of unjust enrichment or reasonable royalty. You can't get those unless there's been commercial use of whatever was taken. And the evidence is clear that there wasn't. And my time is up. So thank you. All right. Thank you very much, Mr. Goldstein. Mr. Hanses, you have a few minutes left in rebuttal. Thank you. This case should be sent back for the court to address the issues regarding 4.2. Mark's intention is going to be that the confidentiality is something different under breach of contract claim. His argument is, well, it's the same. And the court's already decided it. That's what I think the trial court has to address. So I would ask that the case be sent back for the purpose of deciding the 4.2 case. With regard to address the exact issues and the claims the court was discussing, with regard to the argument that it's all credibility, I've been very careful in our furthermore, our position with regard to the non-solicitation provision is that the court misapplied it. There's no requirement that my client, as Mr. Goldstein was arguing, had previously provided the same services to American. If they're provided to any other company, the refund services were provided to any other company. He was also prohibited by doing it under that. And rightfully so, because if a customer can poach an employee, it harms a corporation. With regard to the fare by rule flowchart, it's very clear that it wasn't simply public information. Page 756, did you use AIRFAQ's document to create this flowchart? No, this is based on ATPO processing and my own ideas. And under the agreement that he entered into and agreed to, it provides that all inventions created by the employee during the employment are of the company's information. And the court erroneously stated that, well, since he created it, he had the right to take it. And that's true with regard to the flowcharts. Also, we make the same argument with regard to the probation framework and database model. That's not a credibility determination. It doesn't involve credibility that the court, again, ignored 4.2. If it doesn't require use or intent to use under the Trendy's Corp decision, rather, all we have to prove is that the acquisition was through improper means. Here, it was in violation of 4.2. And accordingly, that's not a credibility determination. It's a straightforward determination. We would ask that the court take into consideration all these arguments and send the case back to the district court. Thank you. Thank you very much. We're going to come down and re-counsel. And I would ask the clerk to adjourn court for the day.
judges: G. Steven Agee, Henry F. Floyd, John A. Gibney Jr.